# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHARLES KING,** | : | **CIVIL NO. 1:CV-13-02186** |
| | : | |
| **Plaintiff** | : | **(Judge Rambo)** |
| | : | |
| **v.** | : | |
| | : | |
| **SERGEANT MYERS, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## M E M O R A N D U M

Plaintiff Charles King initiated this civil rights action pursuant to 42 U.S.C. § 1983 with a complaint filed on August 19, 2013, as amended February 24, 2015. (Doc. 105.)  In the amended complaint, Plaintiff alleges that certain Pennsylvania Department of Corrections ("DOC") officials ("Corrections Defendants")[1] at his former place of confinement, the State Correctional Institution at Smithfield ("SCI-Smithfield") in Huntingdon, Pennsylvania, failed to protect him and to intervene in an assault by his cellmate, an inmate Mitchell.  Plaintiff also asserts claims related to his subsequent medical treatment against Dr. Dolphin, medical personnel at SCI-Smithfield.

---

[1]  Named as Corrections Defendants are Sgt. Myers, Officer Vogt, Officer Clark, and Lt. Allison, all of whom were corrections officers employed at SCI-Smithfield at the time of the relevant events.

Presently before the court is a motion to dismiss filed by Defendant Dr. Dolphin (Doc. 109), and a motion for summary judgment filed by Corrections Defendants (Doc. 124).  For the reasons set forth herein, the court will convert Defendant Dolphin's motion to a motion for summary judgment on the issue of Plaintiff's failure to exhaust his administrative remedies, and both motions for summary judgment will be granted.

## I.   **Background**

For purposes of addressing both the filed motion to dismiss and motion for summary judgment, the court will set forth not only the allegations made in the second amended complaint, but also the statement of material facts asserted by the Corrections Defendants.

### A.   **Allegations in Second Amended Complaint**

Plaintiff sets forth the following allegations in his second amended complaint.[2]

---

[2]   As Plaintiff was advised by the court when filing his first amended complaint, an amended complaint "must be complete in all respects." *Young v. Keohane*, 809 F. Supp. 1185, 1198 (M.D. Pa. 1992).  It must be a new pleading which stands by itself without reference to the original complaint.  *Id*. (*See also* Doc. 21, n.1.)  Further, in the court's January 28, 2015 order granting Plaintiff leave to file a second amended complaint, Plaintiff was directed to file a proposed amended pleading that complies with Middle District Local Rule 15.1.  (Doc. 102.)  That rule states, in pertinent part, that "the proposed amended pleading must be retyped or reprinted so that it will be complete in itself including exhibits and shall be filed on paper as a separate document . . . ." M.D.

On November 9, 2011,[3] while Plaintiff was housed in SCI-Smithfield's Restricted Housing Unit ("RHU"), Defendant Officer Clark approached Plaintiff at his cell, Cell #22, to ask him to take a cellmate. (Doc. 105 ¶ 6.) Defendant Sergeant Myers did not inform Plaintiff that this inmate, inmate Mitchell, had just assaulted another inmate in general population. (*Id*.) Plaintiff alleges that Defendants Lieutenant Allison and Sergeant Myers previously labeled Plaintiff as a "troublemaker;" however, Plaintiff agreed to take the cellmate because he did not want to be charged with a misconduct for refusing to cooperate. (*Id*.)

Plaintiff alleges that, while processing inmate Mitchell for his placement in the RHU, Lieutenant Allison and Sergeant Myers told inmate Mitchell that he was to be celled with a convicted sex offender. (*Id*. ¶ 7.) Shortly thereafter, Defendants Allison, Myers, Vogt, and Clark were all preparing to place inmate Mitchell in RHU Cell #16, but then received radio instructions to place inmate Mitchell in Cell #22 with Plaintiff. (*Id*. ¶ 8.) Inmate Mitchell repeatedly told these Defendants that he would not take a cellmate. (*Id*.)

---

L.R. 15.1(a). Therefore, the court will only set forth the allegations made in Plaintiff's most recently-filed complaint, as it is to be a new pleading which stands by itself.

[3] In the amended complaint, Plaintiff cites this date as "November 16, 2011;" however, from a review of the record as a whole, the date of the incident is November 9, 2011. (Doc. 105 ¶ 6.)

3

When inmate Mitchell arrived at Cell #22, the officers first instructed Plaintiff to come to the tray slot in the door to be handcuffed. (*Id*. ¶ 9.) Plaintiff complied, then moved to the back of the cell as instructed. (*Id*.) The cell door was then opened and Lieutenant Allison placed inmate Mitchell in the cell without handcuffs. (*Id*.)

When Plaintiff approached the cell door to have his handcuffs removed, inmate Mitchell attacked him from behind. (*Id*. ¶ 10.) Plaintiff repeatedly called out, "He's killing me, please help me, I'm having chest pains." (*Id*.) Plaintiff alleges that Defendants Allison, Myers, Vogt, and Clark disregarded Plaintiff's calls for help and instead simply ordered inmate Mitchell to stop punching Plaintiff. (*Id*.) When inmate Mitchell ignored them, these Defendants "merely stood by and did nothing" while inmate Mitchell continued to punch Plaintiff. (*Id*.) After what "seemed like minutes," Defendant Allison opened the cell door and physically subdued inmate Mitchell and removed him from the cell. (*Id*.)

After inmate Mitchell was removed from Cell #22, Plaintiff himself was also removed and taken to another area of the RHU while the cell was processed. (*Id*. ¶ 12.) At that time, Plaintiff asked for permission to take his prescribed glycerin medication that was still in the cell. (*Id*.) Defendants told him that he would have to wait for the cell to be processed. (*Id*.) A short time later, Plaintiff was placed back in

4

Cell #22 and he took his glycerin pills.  (*Id*.)  The cell, however, remained bloody from the attack, and Plaintiff was compelled to use his bare hands and prison-issued shirt to wipe up both his and inmate Mitchell's blood, suffering extreme pain from the assault while doing so.  (*Id*.)  Later, Plaintiff was taken to a medical exam room in the RHU to be assessed by medical staff.  (*Id*. ¶ 13.)  Medical staff examined Plaintiff and took photographs of his injuries.  (*Id*.)

The following day, November 10, 2011, Plaintiff was again examined by medical staff.  (*Id*. ¶ 14.)  A physician's assistant diagnosed Plaintiff as suffering from possible brain injuries, took x-rays, and scheduled Plaintiff for a CT-scan and follow-up consultation with a neurologist.  (*Id*.)

On November 16, 2011, Plaintiff was taken for a CT-scan of his head injuries, but did not see a neurologist for follow-up.  (*Id*. ¶ 15.)  On November 17, 2011, Plaintiff's knee was x-rayed, but he was never advised of the results.  (*Id*. ¶ 16.)

Plaintiff alleges that, from November 21 to December 5, 2011, he submitted approximately eight (8) sick call slips to SCI-Smithfield's medical department.  (*Id*. ¶ 17.)  In those sick call requests, Plaintiff complained of pain in his hands and neck,

numbness in his right thigh, severe headaches, and blurred vision.  (*Id*.)  Plaintiff

alleges that former Defendant Dr. Long ignored his requests.[4]  (*Id*.)

On November 28 and December 6, 2011, Plaintiff wrote to the mental health

department at SCI-Smithfield seeking psychiatric/psychological treatment for

recurring dreams of being assaulted by inmate Mitchell.  (*Id*. ¶ 18.)  Defendant Dr.

Dolphin responded, informing Plaintiff that "somebody" had been contacted to speak

with Plaintiff.  (*Id*.)  However, Plaintiff alleges that no one met with him.  (*Id*.)

On December 18, 2011, Plaintiff filed a formal written grievance complaining

about the lack of medical and mental health treatment.  (*Id*. ¶ 19.)  In response, on

December 20, 2011, Dr. Long met with Plaintiff.  (*Id*.)  He advised Plaintiff that he

would not schedule him for a consultation with a neurologist and he would not refer

Plaintiff to a psychiatrist/psychologist.  (*Id*.)

Some time after the incident at Cell #22, the Pennsylvania State Police

criminally charged inmate Mitchell with assaulting Plaintiff.  (*Id*. ¶ 20.)  As a result of

the November 9, 2011 attack, Plaintiff claims to have suffered the following injuries:

> contusions, lacerations and abrasions sustained to the side of his badly
> swollen and bleeding face, a split upper lip, teeth protruding through a
> laceration on his lower lip, a deep gash in his right middle finger, an

---

[4]  Dr. Long was terminated as a defendant in this action on May 29, 2015.  (*See* Doc.
133.)

6

> injured knee, contusions and abrasions in the chest area, in addition to
> excruciating and continuous pain which stems from spinal and lumbar
> injuries, blurred tunnel vision with flashes of light in his periphery,
> memory loss, impairment of mental ability to focus his attention or
> otherwise clearly process his thoughts, loss of appetite, night tremors,
> sleep deprivation, anxiety, and a severely weakened will power to live in
> a situation where he is dependant on others for his personal safety and
> well-being, which further cultivates anxiety and despair which stems
> from an intense concern with self.

(*Id*. ¶ 21.)

On January 3, 2012, Plaintiff was transferred to SCI-Coal Township.  (*Id*. ¶

22.)  Once there, he presented to the medical department for treatment of his injuries,

but his request for treatment was denied.  (*Id*.)  Thereafter, Plaintiff filed a formal

written grievance complaining about the lack of medical care.  (*Id*. ¶ 23.)  On April

23, 2012, a grievance officer issued an Initial Review Response indicating that former

Defendant Wiesner had been contacted about Plaintiff's complaints and, in turn, he

would issue a physician's order scheduling Plaintiff for a consultation with a

neurologist.[5]  (*Id*.)  Plaintiff alleges he never received that consultation.  (*Id*.)

**B.**   **Statement of Material Facts**

In support of their motion for summary judgment, Corrections Defendants

submitted a statement of material facts.  (Doc. 126.)  Because Plaintiff has failed to

---

[5]  Dr. Wiesner was terminated as a party in this action on May 29, 2015.  (*See* Doc. 133.)

file an opposing statement of material facts as required by Middle District Local Rule 56.1, the following facts submitted by Corrections Defendants are deemed admitted.

As stated above, the incident at issue in this case occurred on November 9, 2011. (Doc. 105 ¶ 6.) Earlier that day, inmate Mitchell received a misconduct for a mutual fight in the prison's general population yard.[6] (Doc. 126 ¶ 1.) As a result of the fight, inmate Mitchell was escorted to the RHU and placed in administrative custody ("AC") status pending adjudication of his misconduct.[7] (*Id*. ¶ 2.) Defendant Sergeant Myers was working in the general population yard on that day, and therefore was assigned to escort inmate Mitchell to the RHU. (*Id*. ¶ 3.) But the escorting officers were only told to which cell to bring inmate Mitchell. (*Id*. ¶ 5.)

---

[6] There is no indication that the inmate who Mitchell fought with in the yard was his cellmate.

[7] Plaintiff does not dispute this fact through the filing of a counter statement of material facts. However, in his brief in opposition to the motion for summary judgment, Plaintiff argues that inmate Mitchell was placed in the RHU under disciplinary custody ("DC") status rather than AC status, and therefore Defendants should have known inmate Mitchell was a threat to Plaintiff's safety. (*See* Doc. 131.) In support, he attaches inmate Mitchell's disciplinary hearing report from his November 14, 2011 hearing related to the November 9, 2011 incident in the prison yard with another inmate that occurred prior to the incident at issue here. (Doc 131, Ex. A-2.) In that report, the hearing officer found inmate Mitchell guilty of fighting and sanctioned him with "removal from job (as per policy) and 45 days DC effective 11-09-2011." (*Id*.) Upon review of that report, it is clear that inmate Mitchell was not formally sanctioned with DC status until November 14, 2011. Therefore, the record belies Plaintiff's contention that inmate Mitchell entered the RHU on November 9, 2011 on DC status.

8

At the time of the assault, Plaintiff was also on AC status.  (*Id*. ¶ 19.)  Plaintiff was placed on AC status because he had a separation from a staff member who accused Plaintiff of threatening her.  (*Id*. ¶ 20.)  Further, he was being kept on AC status in the RHU pending a separation transfer to another facility.  (*Id*. ¶ 21.)  Given these circumstances, Plaintiff was not in AC status due to any concern for his own safety.  (*Id*. ¶ 22.)

Neither inmate Mitchell nor Plaintiff had a "Z Code" which requires an inmate to be single-celled.  (*Id*. ¶ 18.)  Further, when determining cell assignments, RHU staff tries to accommodate inmates' celling needs by considering RHU status, race, and age, subject to cell availability.  (*Id*. ¶ 6.)  Defendant Lieutenant Allison, the RHU Lieutenant, believed that celling inmate Mitchell and Plaintiff together was the best available option because both Plaintiff and inmate Mitchell were Causcasian inmates who were on AC status and all other available cells were occupied either by an inmate of a different race, RHU status, or an inmate refusing a cellmate.  (*Id*. ¶ 7.)  Further, Sergeant Myers was not assigned to the RHU on the day of the assault, and therefore was not involved in the decision of where to place inmate Mitchell when he escorted him into the RHU.  (*Id*. ¶ 4.)

9

The entire escort of inmate Mitchell was videotaped.  (*Id*. ¶ 8.)  The video footage of the escort also depicts the activity outside the cell before, during, and after the assault.  (*Id*.)  Inmate Mitchell's escort began on the K-Block at the time marked on the camera clock as 4:42:56.  (*Id*. ¶ 10) (citing Doc. 127, Defs' Ex. A, Video Recording of Mitchell Escort.)  Inmate Mitchell is escorted through a hallway and then outside through the prison yard, remaining silent the entire time.  (Doc. 126 ¶¶ 11, 13.)  He and his escorts arrive at another building at approximately 4:46:37.  (*Id*. ¶ 11.)  Once there, inmate Mitchell is placed in a strip search cage at 4:47:21, and strip searched at 4:49.  (*Id*. ¶¶ 12, 14.)  After the strip search, Sergeant Myers reads inmate Mitchell a list of questions designed to determine whether inmate Mitchell was a suicide risk.  (*Id*. ¶ 15.)  Inmate Mitchell answers no to all the questions.  (*Id*. ¶ 16.)

At 4:51:50, over the radio another officer directs Defendant Lieutenant Allison to transfer inmate Mitchell to cell B22.  (*Id*. ¶ 17.)  At 4:52:24, inmate Mitchell is removed from the strip search cell and escorted towards cell B22.  (*Id*. ¶ 24.)  During

this transfer, inmate Mitchell is silent.[8]  (*Id*. ¶ 25; Doc. 127, Defs' Ex. A.)  He does

not threaten to harm a cellmate or refuse to be double-celled.  (Doc. 126 ¶ 23.)

At 4:53:47, the escorting officers open the door to cell B22, and inmate

Mitchell is placed in that cell at 4:53:54.  (*Id*. ¶ 26.)  The handcuffs are removed from

inmate Mitchell at 4:54:03.  (*Id*. ¶ 27.)  At 4:54:06, Sergeant Myers states, "We got a

fight in here," and immediately alerts Lieutenant Allison, the ranking officer.  (*Id*. ¶

28.)  The RHU bubble officers have exclusive control over the opening and closing of

the doors in the RHU through the control devices in the RHU bubble.  (*Id*. ¶ 29.)

Sergeant Myers was not assigned to the RHU that day and, therefore, the radio he was

equipped with did not have the capability to communicate with the RHU bubble.  (*Id*.

¶ 30.)  Even so, Lieutenant Allison arrives at the cell B22 door at 4:54:13, seven (7)

seconds after Sergeant Myers called for him.  (*Id*. ¶ 31.)

---

[8]  In his amended complaint, Plaintiff alleges, "While Defendants Allison and Myers were processing Inmate Mitchell for placement in the RHU, they told him that he was going to be placed in a cell with a convicted sex offender."  (Doc. 105 ¶ 7.)  Nothing in the record, including the videotape of the escort, shows that these Defendants made this statement.  Further, inmate Mitchell's disciplinary hearing report related to the incident at issue notes that he made the following statement in connection with his guilty plea: "Everything they say is what occurred with a reason, I was told he was a sex offender, had a bad day, death in family, something I wouldn't do every day, Mom died that day, haven't had an opportunity to tell anyone about the death."  (Doc. 131, Ex. B.)  The disciplinary hearing officer did not note who may have told inmate Mitchell that Plaintiff was a sex offender.  (*See id*.)

The escorting officers order inmate Mitchell to stop fighting at least three (3) times from 4:54:15 to 4:54:20.  (*Id*. ¶ 32.)  The video footage also shows that Lieutenant Allison had a short conversation with inmate Mitchell through the cell door from 4:54:23 to 4:54:29.  (*Id*. ¶ 33.)  During the conversation, Lieutenant Allison is giving instructions to inmate Mitchell, and Mitchell is not attacking Plaintiff.  (*Id*. ¶ 34.)  In light of the responses inmate Mitchell gave to the instructions, Lieutenant Allison believed that inmate Mitchell had ceased the assault and was going to voluntarily submit to being handcuffed through the door, which is a safer situation for staff.  (*Id*. ¶ 35.)  However, after Lieutenant Allison gave his orders, inmate Mitchell resumed his attack on Plaintiff.  (*Id*. ¶ 36.)

When inmate Mitchell resumed his attack, Lieutenant Allison immediately called for the cell door to be opened, and inmate Mitchell was restrained.  (*Id*. ¶ 37.)  More specifically, the video footage shows the cell door being opened at 4:54:35.  (*Id*. ¶ 38.)  After the door opens, officers immediately secure inmate Mitchell on the floor and he is removed from the cell.  (*Id*. ¶ 39.)  Thereafter, at the end of the video, the officers conduct a debriefing as to what occurred.  (*Id*. ¶ 40.)  During that debriefing, all of the officers involved in the escort of inmate Mitchell are identified:

Lieutenant Allison, Sergeant Myers, and Officer Morgan.  (*Id.* ¶ 9.)  Also, the camera

operator is identified as Officer Kuzman.  (*Id.*)

In addition to these facts pertaining to the attack, Corrections Defendants assert

the following with respect to individual Defendants Officers Clark and Vogt.  Neither

Officer Clark nor Officer Vogt were involved in any manner in the escort of inmate

Mitchell.  (*Id.* ¶ 41.)  As to Officer Vogt, he was not present when the assault

occurred, and therefore had no opportunity to intervene.  (*Id.* ¶ 42.)  As to Officer

Clark, he was not involved in the decision to house inmate Mitchell with Plaintiff.

(*Id.* ¶ 43.)  Also, Officer Clark was not present when the assault began, but responded

when it was in progress.  (*Id.* ¶ 44.)  He arrived at the cell door just at the time the

door opened.  (*Id.* ¶ 45.)  In fact, his only role was escorting Plaintiff to medical as the

other officers restrained inmate Mitchell.  (*Id.* ¶ 46.)

Finally, Corrections Defendants submit the following as to Plaintiff's

exhaustion of relevant requests for administrative remedies prior to filing this action.

Plaintiff filed two grievances related directly to the actions of corrections officers

during the assault on November 16, 2011: Grievance No. 389427 and Grievance No.

390997.  (*Id.* ¶ 58.)  Neither of these grievances complained in any way about any

staff member at SCI-Smithfield requiring Plaintiff to be unsafely exposed to blood

after the alleged assault when he was placed back into his cell.  (*Id*. ¶ 59.)  In fact, Plaintiff never filed a grievance complaining in any way about being forced to clean up blood or being unsafely exposed to blood in his cell after the assault.  (*Id*. ¶ 60.)

### C.    Relevant Procedural History

On January 28, 2015, the court granted Plaintiff leave to file a second amended complaint.  (Doc. 102.)  Plaintiff filed that second amended complaint on February 24, 2015.  (Doc. 105.)  The new complaint added a new defendant, Lt. Allison, and omitted an existing one, Mr. Poland.  (*See id*.)  By order issued March 17, 2015, the court accepted for filing Plaintiff's second amended complaint, terminated Mr. Poland as a defendant, and directed service of the complaint on Lt. Allison.  (Doc. 113.)  Further, because Lt. Allison is a DOC employee, the court gave Corrections Defendants the opportunity to amend a previously-filed motion for summary judgment.  (*Id*.)  Subsequently, Corrections Defendants filed an amended motion for summary judgment on April 27, 2015.  (Doc. 124.)  In addition, Dr. Dolphin filed a motion to dismiss or for summary judgment on March 11, 2015.  (Doc. 109.)  Both motions are fully briefed and ripe for disposition.

## II.     **Standards of Review**

### A.     **Motion to Dismiss**

Defendant Dr. Dolphin has filed a motion which, in part, also seeks dismissal of the complaint on the grounds that Plaintiff's complaint fails to state a claim upon which relief can be granted, as provided by Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The motion, however, goes beyond a simple motion to dismiss under Rule 12(b)(6) because it is accompanied by evidentiary documents outside the pleadings that contravene Plaintiff's claims.  Rule 12(d) provides as follows:

> If, on a motion under Rule 12(b)(6) or (12)(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d).  The court will not exclude the evidentiary materials accompanying Defendant Dr. Dolphin's motion to dismiss because Plaintiff has also been given a reasonable opportunity to present material relevant to the motion.  Thus, the court will convert Defendant Dr. Dolphin's motion to dismiss under Rule 12(b)(6) to a motion for summary judgment.

15

### B.     Motion for Summary Judgment

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for granting a motion for summary judgment.  Rule 56(a) provides, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party. *Id*.  When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party," and draw all reasonable inferences in favor of the same.  *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005), *cert. denied*, 546 U.S. 1094 (2006).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact.  *See Celotex*, 477 U.S. at 324.  "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of

16

material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010) (citation omitted). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

### III.  **Discussion**

Plaintiff asserts claims under 42 U.S.C. § 1983 for (1) failure to protect; (2) failure to intervene; (3) inadequate medical/mental health care; and (4) unconstitutional conditions of confinement.  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Therefore, to succeed on his claims, Plaintiff must establish two elements: (1) that a person deprived him or caused him to be deprived of a right secured by the Constitution or law of the United States; and (2) that the deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42. 48 (1988).  Since both sets of Defendants do not dispute that they were acting under color of state law, the only issue for the court to decide is whether they caused Plaintiff to suffer deprivations of a constitutional magnitude.  In this regard, Corrections Defendants argue that summary judgment should be granted in their favor because: (1) Plaintiff's failure to protect claim fails because Corrections Defendants were not deliberately indifferent to a serious risk of harm posed to Plaintiff prior to the assault; (2) Plaintiff's failure to intervene claim fails because Corrections

18

Defendants acted reasonably to intervene; and (3) Plaintiff's Eighth Amendment conditions of confinement claim relating to blood exposure fails because Plaintiff did not exhaust his administrative remedies with respect to this claim prior to bringing suit.  Defendant Dr. Dolphin argues that summary judgment should be granted in his favor because: (1) Plaintiff failed to exhaust his administrative remedies with respect to all claims against Dr. Dolphin; (2) Plaintiff has failed to state a claim against Dr. Dolphin; and (3) Plaintiff has failed to show that Dr. Dolphin's conduct warrants punitive damages.[9]  The court will discuss these issues by addressing Corrections Defendants' arguments in opposition of Plaintiff's failure to protect and failure to intervene claims first, followed by a consolidated discussion of the failure to exhaust arguments posed by both sets of Defendants.

## A.   **Failure to Protect Claim**

Corrections Defendants contend that Plaintiff has failed to show that they were deliberately indifferent to any serious risk of harm posed by inmate Mitchell.  Upon review of the record, including the videotape footage, the court finds there to be no genuine issue of material fact as to whether Corrections Defendants were aware of an

---

[9]  Because the substantive claims against Dr. Dolphin will be dismissed, the court need not discuss Plaintiff's request for punitive damages against Dr. Dolphin.

actual threat to Plaintiff posed by inmate Mitchell and failed to protect Plaintiff from that threat.

The Eighth Amendment requires a prison official to "take reasonable measures to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). While a prison official has a duty to protect prisoners from attacks by other prisoners, not every injury suffered by a prisoner at the hands of another translates to constitutional liability for the official responsible for the prisoner's safety. *Id.* at 833-34. An inmate making a failure to protect claim has the burden of proof to establish that a prison official both knew of and chose to disregard an "excessive risk to inmate health or safety." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 837). The United States Court of Appeals for the Third Circuit has further held that the knowledge requirement is subjective, "meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Id.*; *see Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997). Actual knowledge can be proven circumstantially where the general danger was obvious. *Farmer*, 511 U.S. at 842. For example, if the prisoner-plaintiff

> presents evidence showing that a substantial risk of inmate attacks was
> "longstanding, pervasive, well-documented, or expressly noted by prison

> officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

*Id*. at 842-43.  Finally, "a defendant can rebut a *prima facie* demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring."  *Beers-Capitol*, 245 F.3d at 133.

Here, Corrections Defendants do not appear to dispute that the record evidence shows that Plaintiff suffered a deprivation that was "objectively sufficiently serious." *See Knowles v. New York City Dep't of Corr.*, 904 F. Supp. 217, 221 (S.D.N.Y. 1995) (holding that inmate assaulted by a fellow inmate using a sharp object to cut the plaintiff's face and who subsequently received stitches, met the objective requirement of the Eighth Amendment).  Instead, the dispute turns on whether Corrections Defendants had the culpable intent necessary to sustain a claim of failure to protect. The United States Supreme Court repeatedly has emphasized that this standard is a stringent standard of fault, requiring proof that a defendant disregarded a *known or obvious consequence* of his action.  *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520

21

U.S. 397, 410 (1997) (emphasis added).  Thus, where officers have clear notice of the risk of harm, summary judgment is generally denied.

Corrections Defendants argue that Plaintiff has failed to establish: (1) that inmate Mitchell posed a serious risk of harm to him, and (2) that they were aware of any such threat of harm.  More specifically, Defendants claim that each theory alleged by Plaintiff with regard to this failure to protect claim is controverted by the undisputed evidence in the record.  The court will discuss these theories in turn.

First, as Corrections Defendants point out, Plaintiff's complaint originally was based on the allegation that inmate Mitchell repeatedly told the escorting officers that he would not accept a cellmate, and that this assertion was loud enough to be overheard by other inmates.  (*See also* Doc. 105 ¶ 8.)  However, the videotape footage submitted shows the entire escort of inmate Mitchell to which Plaintiff refers.  The footage also includes the audio of that escort.  At no point during the recorded escort does inmate Mitchell indicate that he would refuse a cellmate or harm a cellmate.  In fact, inmate Mitchell was, for the most part, silent and cooperative during the escort.  In addition, as submitted by Corrections Defendants, inmate Mitchell did not have a Z-code, which would require him to be single-celled.  In light of this evidence,

Plaintiff has failed to establish that inmate Mitchell put Corrections Defendants on notice that he would harm his cellmate.

Second, included in Plaintiff's second amended complaint is a new allegation that Lieutenant Allison and Sergeant Myers told inmate Mitchell during processing into the RHU that he was to be celled with a convicted sex offender. (Doc. 105 ¶ 7.) However, the videotape footage of inmate Mitchell's processing refutes this allegation. These Defendants never made such a statement to inmate Mitchell, and therefore Plaintiff has not established here that Corrections Defendants were on notice that inmate Mitchell would harm his cellmate due to his status as a convicted sex offender.

Third, Plaintiff seemingly alleges that he was under "protective custody" in the RHU, and therefore staff should have known not place inmate Mitchell in his cell. (*See generally*, Doc. 105.) However, the record shows that Plaintiff was being held on AC status to effectuate his separation from a staff member who accused him of threatening her, and not for his own protection. (Doc. 126 ¶¶ 19-22.) As a result, there is nothing to support a failure to protect claim here.

Fourth, Plaintiff alleges that Corrections Defendants should have been aware of the risk of harm to him because inmate Mitchell was placed in the RHU for assaulting

his previous cellmate.  (Doc. 105 ¶ 6.)  However, this is simply not the case.  While it

is true that inmate Mitchell was placed in the RHU for fighting, he was involved in a

mutual fight with another inmate in the prison yard.  That inmate was not his

cellmate.  The circumstances of this previous fight alone simply do not lead the court

to believe any prison official had actual knowledge of a substantial risk of harm to

Plaintiff by celling him with inmate Mitchell.

Finally, Corrections Defendants argue that there is no genuine issue of material

fact that Defendants Clark or Myers could be liable with respect to the November 9th

incident.  Plaintiff alleges that Defendant Clark asked Plaintiff to take a cellmate prior

to placing inmate Mitchell in his cell.  (Doc. 105 ¶ 6.)  He also claims that, at that

time, Sergeant Myers failed to inform him of inmate Mitchell's previous fight.  (*Id*.)

Plaintiff asserts that Officer Clark and Sergeant Myers ignored his pleas for help once

the assault began; rather, after inmate Mitchell disregarded the verbal order to cease

fighting, they "merely stood by and did nothing" while inmate Mitchell continued to

assault him.  (*Id*. ¶ 10.)

The undisputed material facts belie these allegations.  As to Defendant Clark,

he was not involved in the decision to cell inmate Mitchell with Plaintiff.  (Doc. 126 ¶

43.)  Officer Clark was not involved in the escort of inmate Mitchell and, therefore,

was not present when the assault began at the cell.  (*Id*. ¶¶ 41, 44.)  Rather, he responded once the assault began and arrived at the cell door just at the time it opened.  (*Id*. ¶¶ 44, 45.)  Officer Clark's role that day was to escort Plaintiff to medical while other officers restrained inmate Mitchell.  (*Id*. ¶ 46.)  In light of these undisputed facts, a failure to protect claim against Defendant Clark fails.

Turning to Defendant Myers, initially it is noted that Sergeant Myers was assigned to the general population yard that day and not the RHU.  (*Id*. ¶ 3.)  As a result, he was assigned to escort inmate Mitchell from the yard to the RHU for processing.  (*Id*.)  Escorting officers are told only where to bring an inmate; they are not involved in the decision of cell assignment.  (*Id*. ¶¶ 4, 5.)  Further, after inmate Mitchell was placed in the cell and began the attack, Sergeant Myers, who was present at that time, immediately alerted Lieutenant Allison, the ranking officer.  (*Id*. ¶ 28.)  Because Sergeant Myers was not assigned to the RHU that day, he was not equipped with a radio that could communicate directly with the RHU bubble which controls the movement of cell doors.  (*Id*. ¶ 30.)  Therefore, he did not have the capability of opening the cell door and physically restraining inmate Mitchell the moment the assault began.  Again, Defendant Myers was simply assigned to escort inmate Mitchell from the yard to the RHU.  Nevertheless, Defendant Myers acted

immediately when the assault began.  Therefore, a failure to protect claim against him fails.

Because Plaintiff has failed to establish a failure to protect claim by demonstrating that Corrections Defendants were deliberately indifferent to any serious risk of harm posed by inmate Mitchell, the court will grant summary judgment here in favor of Corrections Defendants.

### B.   **Failure to Intervene Claim**

Corrections Defendants argue that Plaintiff's claim that they "merely stood by and did nothing" while inmate Mitchell attacked him in the cell does not establish an Eighth Amendment violation for failure to intervene.

> When the ever-present potential for violent confrontation and conflagration ripens into actual unrest and conflict, the admonition that a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators carries special weight.  Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.  That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventative measures intended to reduce the incidence of these or any other breaches of prison discipline.  It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor just freely substitute their judgment for that of officials who have made a considered choice.  Accordingly, . . . courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a

> particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in a light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.

*Shelton v. Bledsoe*, No. 3:11-CV-1618, 2012 WL 5267034, at *6 (M.D. Pa. Oct. 24, 2012), *vacated in part on other grounds*, 775 F.3d 554 (3d Cir. 2015), (quoting *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986) (internal quotations and citations omitted).  In order to prevail on a failure to intervene claim, the plaintiff must show: "(1) that the defendant failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was a 'realistic and reasonable opportunity to intervene.'"  *Knight v. Walton*, No. 2:12-CV-984, 2014 WL 1316115, at *8 (W.D. Pa. Mar. 28, 2014) (quoting *Smith v. Mensinger*, 293 F.3d 641, 651 (3d Cir. 2002)) (citation omitted).[10]

---

[10]  In *Smith v. Mensinger*, the Third Circuit Court of Appeals held that a corrections officer who fails to intervene when other officers are beating an inmate may be liable on a failure-to-protect claim if the officer had "a realistic and reasonable opportunity to intervene" and "simply refused to do so."  *Smith*, 293 F.3d at 650-51.  In a 2012 case, the Third Circuit extended that standard to inmate-on-inmate attacks.  *See Bistrian v. Levi*, 696 F.3d 352, 371 (3d Cir. 2012) ("We are hardly breaking new ground by extending [the *Smith*] standard to inmate-on-inmate attacks.").  The *Bistrian* Court further stated, "As the Court of Appeals for the Seventh Circuit has observed, if an officer witnesses an inmate assault and fails to intervene, 'his actions would seemingly constitute a paradigm case of deliberate indifference.'"  *Id.* (quoting *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008).)

In this case, there is no evidence demonstrating that Corrections Defendants failed or refused to intervene in violation of the Eighth Amendment. Importantly, the placement of inmate Mitchell in Cell B22 is captured entirely on video. After inmate Mitchell is placed in the cell at 4:53:54 and his handcuffs removed at 4:54:03, three (3) seconds later Sergeant Myers calls out to Lieutenant Allison that a fight is occurring in the cell. (Doc. 126 ¶¶ 26-28.) Because Sergeant Myers was not assigned to the RHU that day, his radio could not communicate with the RHU bubble, where the officers who control the movement of cell doors are located. (*Id*. ¶ 29.) But, nevertheless, Lieutenant Allison arrives at the cell door at 4:54:13, seven (7) seconds after Sergeant Myers called for him. (*Id*. ¶ 31.) During the next five (5) seconds (from 4:54:15 to 4:54:20), the escorting officers order inmate Mitchell to stop fighting at least three (3) times. (*Id*. ¶ 32.) Next, Lieutenant Allison has a short conversation with inmate Mitchell through the cell door from 4:54:23 to 4:54:29, at which time inmate Mitchell was not attacking Plaintiff. (*Id*. ¶ 33.) Based on inmate Mitchell's responses to Lieutenant Allison's instructions, the Lieutenant believed that inmate Mitchell had ceased the assault and would voluntarily submit to handcuffs through the cell door. (*Id*. ¶¶ 34, 35.) Having an inmate submit to restraints through a cell door is safer for staff than opening the cell door. (*Id*.) Unfortunately, inmate

28

Mitchell resumes his attack after conversing with Lieutenant Allison. (*Id*. ¶ 36.) At that time, Lieutenant Allison immediately calls for the cell door to be opened. (*Id*. ¶ 37.) The door is opened at 4:54:35, thirty-two (32) seconds after inmate Mitchell's handcuffs were removed and twenty-nine (29) seconds after Sergeant Myers initially called out to Lieutenant Allison, and inmate Mitchell is restrained and removed from the cell. (*Id*. ¶¶ 38, 39.)

In light of this clear evidence contradicting Plaintiff's claim that Corrections Defendants "merely stood by and did nothing," the court finds that Plaintiff has failed to establish an Eighth Amendment violation for failure to intervene with respect to the assault upon him in the RHU cell on November 9, 2011. More specifically, the time taken to put an end to inmate Mitchell's assault is insufficient to give rise to an inference of deliberate indifference to Plaintiff's safety by Corrections Defendants. *See Bracey v. Harlow*, No. 11-CV-4E, 2013 WL 5331978, at *12 (W.D. Pa. Sept. 23, 2013), *aff'd*, 571 F. App'x 75 (3d Cir. 2014) (rejecting the plaintiff's failure to intervene/protect claim where defendants waited four minutes to subdue the attacking inmate after being called immediately to respond). Accordingly, summary judgment will be granted in favor of Corrections Defendants.

## C.     Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA"), as amended, 42 U.S.C. § 1997e, requires prisoners to present their claims through an administrative grievance process before seeking redress in federal court.  The Act specifically provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. § 1997e(a).  A prisoner must comply with the PLRA exhaustion requirement as to any claim that arises in the prison setting, regardless of the nature of the claim or of the relief sought.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001).  "[I]t is beyond the power . . . of any . . . [court] to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis."  *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000).  Failure to exhaust administrative remedies is an affirmative defense that must be pled and proven by the defendant.  *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002) (reasoning that "[p]rison officials are likely to have greater legal expertise and, as important, superior access to prison administrative records in comparison to prisoners").

30

Further, the PLRA mandates that a prisoner "properly" exhaust administrative remedies before filing suit in federal court, which demands compliance with an agency's deadlines and other procedural rules. *Woodford v. Ngo*, 548 U.S. 81, 92 (2006); *Spruill v. Gillis*, 372 F.3d 218, 230 (3d Cir. 2004) (concluding that the PLRA includes a procedural default component); *Rivera v. Pa. Dep't of Corr.*, 388 F. App'x 107, 108 (3d Cir. 2010) ("An inmate must exhaust his administrative remedies *prior* to filing a civil action in federal court.") (emphasis added).  A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim. *McKinney v. Kelchner*, No. 1:05-CV-0205, 2007 WL 2852373, at *3 (M.D. Pa. Sept. 27, 2007) (citing *Spruill*, 372 F.3d at 227-32; *Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000)).

The Pennsylvania Department of Corrections ("DOC") has an Inmate Grievance System which permits any inmate to seek review of problems that may arise during the course of confinement.  37 Pa. Code § 93.9(a); *see also* www.cor.state.pa.us, DOC Policies, Policy No. DC-ADM 804, Inmate Grievance System.  After an attempt to resolve any problems informally, an inmate may submit a written grievance to the facility's Grievance Coordinator for initial review.  An

31

inmate may then appeal an adverse decision of the Grievance Coordinator to the Superintendent of the institution, and can finally appeal to the Secretary of the DOC Office of Inmate Grievances and Appeals ("SOIGA"). *See Booth v. Churner*, 206 F.3d 289, 293 n.2 (3d Cir. 2000) (outlining Pennsylvania's grievance review process).

In the present case, both Corrections Defendants and Defendant Dr. Dolphin argue that certain claims set forth by Plaintiff should be dismissed for failure to exhaust his administrative remedies. The court will discuss these arguments separately.

### 1.   Eighth Amendment Conditions of Confinement Claim

Corrections Defendants argue that Plaintiff has failed to exhaust his administrative remedies with respect to his claim that he was forced to use his bare hands to clean up inmate Mitchell's blood in his cell after the assault. After reviewing the relevant grievances and responses thereto, the court agrees with Corrections Defendants and will grant summary judgment in their favor.

The record reflects that Plaintiff filed two grievances relating to his failure to protect/failure to intervene claims. On November 14, 2011, Plaintiff filed Grievance No. 389427, complaining about the corrections officers' response to inmate Mitchell's assault. (Doc. 127-9, Ex. K.) Nowhere in this grievance is mention of

Plaintiff being exposed to blood or any other hazardous waste after the assault.  On November 23, 2011, Plaintiff filed Grievance No. 390997, complaining again about the corrections officers' failure to protect him from inmate Mitchell and also about a lack of subsequent medical care.  (Doc. 127-10, Ex. L.)  As with the previously-filed grievance, there is no mention whatsoever of Plaintiff being forced to clean up blood in his cell.  The filing of these grievances clearly demonstrates that the prison grievance system was available to Plaintiff and that he knew how to access it. Plaintiff argues in his opposing brief that some corrections officers refused to assist him in the filing of a grievance by failing to provide him with forms, (*see* Doc. 131 at 20), but the record clearly belies this assertion.  Even so, Plaintiff asserts that, "[n]otwithstanding these limitations, Mr. King still managed to fully exhaust his administrative remedies by making his own."  (*Id.*)  Because Plaintiff failed to raise and exhaust his claim through the DOC's grievance system prior to raising it in federal court, he is barred from bringing it now.  Further, the court finds no equitable considerations that would nevertheless warrant review of this claim.[11]

---

[11]   In his brief in opposition, Plaintiff claims that, because of the injuries he sustained in the assault, he "could not retain a lot of what was going on," and so did not include any facts relating to this claim in his grievances.  (Doc. 131 at 13.)  Given the details provided by Plaintiff in his multiple grievances and appeals therefrom, as well as the filings made in this civil action, (*see* Docs. 105, 127-9, 127-10), the court does not accept such an argument conveniently made only after Corrections Defendants contend failure to exhaust at the summary judgment stage of this litigation.

Notwithstanding Plaintiff's failure to exhaust his administrative remedies with respect to this claim, the court notes that Plaintiff has not pleaded any facts relating to how long he was exposed to the blood or the time it took him to clean it up, nor has he alleged any injury as a result of his exposure to the blood.  As a result, summary judgment will be entered in favor of Corrections Defendants with respect to this claim.

### 2.     Eighth Amendment Inadequate Mental Health Care Claim

Defendant Dr. Dolphin argues that Plaintiff has failed to exhaust his administrative remedies with respect to his claim for inadequate mental health care. After review of the relevant grievances and responses thereto, the court agrees with Defendant Dr. Dolphin and summary judgment will be granted in his favor.

The record reflects that Plaintiff filed four grievances relating to medical and/or mental health care following the November 9, 2011 assault.  The background on these grievances is as follows.

### a.     Grievance Nos. 389427 & 390997

On November 14, 2011, Plaintiff filed Grievance No. 389427, complaining about the corrections officers' response to inmate Mitchell's assault.  (Doc. 110-3 at 25-26.)  Plaintiff does not mention Dr. Dolphin or outline any lack of mental health

treatment; he does state that he intends to file a lawsuit against the officers for "pain and suffering, as well as deliberate indifference," and states, "[t]his has caused a lot of emotional and mental damage as well as a lot of physical damage." (*Id*. at 26.) In an initial review response dated November 22, 2011, an SCI-Smithfield Lieutenant denied the grievance, noting that, after reviewing the video footage of the incident, he believed "staff reacted very quickly and appropriately to this situation." (*Id*. at 24.)

The next day, on November 23, 2011, Plaintiff filed another grievance, Grievance No. 390997, complaining again about the officers' response to the assault, but also adding complaints about a lack of medical care following the attack. (*Id*. 34-35.) However, in that grievance, Plaintiff does not mention Dr. Dolphin or a lack of mental health treatment. (*Id*.) On December 1, 2011, the facility grievance coordinator rejected Grievance No. 390997 as duplicative of Grievance No. 389427. (*Id*. at 33.) Plaintiff appealed the rejection of Grievance No. 390997 on December 3, 2011, (*id*. at 31-32), but the appeal was denied on December 15, 2011, by the facility manager/Superintendent (*id*. at 30).

On December 23, 2011, Plaintiff appealed Grievance No. 389427 to SOIGA, (*id*. at 23), but on January 6, 2012, the appeal was rejected because Plaintiff had not yet appealed that grievance to the facility manager (*id*. at 22). On January 12, 2012,

35

Plaintiff appealed both Grievance No. 389427 and 390997 to SCI-Smithfield's Superintendent. (*Id*. at 18-21.)  On February 2, 2012, the Superintendent wrote to Plaintiff, informing him that his appeal from the response to Grievance No. 389427 was received and will be processed, and that his appeal from the response to Grievance No. 390997 was rejected. (*Id*. at 17.)  Thereafter, on February 7, 2012, the Superintendent upheld the response to Grievance No. 389427, noting again that staff acted accordingly in response to inmate Mitchell's assault. (*Id*. at 16.)  On February 20, 2012, Plaintiff appealed the decision on Grievance No. 389427 to SOIGA. (*Id*. at 12-15.)  In the appeal, Plaintiff argues that Grievance No. 390997 should not have been rejected as duplicative because it included new complaints, such as a claim for lack of medical care by the medical department following the assault. (*Id*. at 14-15.)  Plaintiff also appears to have filed a similar appeal on February 22, 2012. (*Id*. at 11.)  On March 15, 2012, SOIGA responded, seeking further action on Plaintiff's appeal from Grievance No. 389427, including "a legible copy of your initial grievance, signed & dated," an "initial review response/rejection by Grievance Officer," "a legible copy of your appeal to Facility Manager, signed & dated," and "Facility Manager's decision/response." (*Id*. at 10.)  Further, on March 20, 2012, SOIGA

informed Plaintiff that he had not yet appealed Grievance No. 390997 to the facility manager. (*Id*. at 29.)

On April 11, 2012, SOIGA sent Plaintiff a decision on both grievances, noting that in response to Plaintiff's correspondence stating that he has received no replies from SOIGA to his grievances, no further action would be taken because "Review of the record indicates that this office sent you an Action Required letter dated 3/15/2012 in regards to grievance number 389427.  Also, on 3/20/2012 this office sent you a letter in regards to grievance number 390997." (*Id*. at 9.)  Subsequent to this decision, however, SOIGA responded yet again to Plaintiff's appeals.  First, on May 1, 2012, SOIGA dismissed Grievance No. 390997 as not submitted timely. (*Id*. at 27.)  And finally, on May 15, 2012, SOIGA upheld the decision on Grievance No. 389427, finding that the "staff had no indication that by placing this inmate in the cell that it would create any problem and there was no evidence of deliberate indifference to you." (*Id*. at 8.)

### b.   Grievance No. 393590

On December 18, 2011, Plaintiff filed Grievance No. 393590, complaining about the injuries he received during the assault. (Doc. 110-3 at 42-43.)  According to Plaintiff, he had pain in his neck, lower back, chest, and left hand, as well as

numbness in his left leg. (*Id*. at 43.)  Although he had "about 12 x-rays done," he had

still not received a physical examination by a medical doctor, including a neurologist,

nor had he had an MRI.  (*Id*.)  There is no mention of Dr. Dolphin or a lack of mental

health treatment in this grievance.[12]  (*Id*. at 42-43.)  In the initial review response

dated January 6, 2012, the grievance officer informed Plaintiff that a Dr. Long

reviewed his records and saw no clinical reason for Plaintiff to been seen by a

neurologist or have an MRI.  (*Id*. at 41.)  The grievance officer also noted that

Plaintiff had since been transferred to SCI-Coal Township and could pursue further

treatment there, if necessary.  (*Id*.)  Plaintiff appealed that decision to the facility

manager on January 20, 2012, who upheld the grievance officer's response in a

decision dated January 31, 2012.  (*Id*. at 39.)  The facility manager also advised

Plaintiff to contact SCI-Coal Township's medical department, if he desired.  (*Id*.)  On

April 3, 2012, Plaintiff wrote to the SCI-Smithfield Superintendent, informing him

that he never received a response to his appeal from the facility manager.  (*Id*. at 38.)

The Superintendent responded on April 6, 2012, indicating that the facility manager's

response was mailed to Plaintiff at SCI-Coal Township on February 10, 2012, and

---

[12]  A review of this grievance reveals that, contrary to what Plaintiff avers in his second amended complaint, Plaintiff did not assert a complaint about a lack of mental health treatment. (*See* Doc. 105 ¶ 19.)

therefore another copy of the response would not be mailed.  (*Id*. at 37.)  Plaintiff

appealed to SOIGA, and on April 24, 2012, a grievance officer there noted that

Plaintiff's grievance would be filed without further action because the Superintendent

had already responded to Plaintiff's appeal on January 31, 2012, with no further

action taken by Plaintiff.  (*Id*. at 36.)

### c.   Grievance No. 410252

On April 23, 2012, Plaintiff filed Grievance No. 410252, complaining about

the lack of medical care he received since his transfer to SCI-Coal Township on

January 3, 2012.  (*Id*. at 7.)  His complaints relate back to the injuries Plaintiff claims

to have received from inmate Mitchell's assault, but do not mention Dr. Dolphin or a

lack of mental health treatment.  (*Id*.)  On May 3, 2012, SCI-Coal Township's

grievance coordinator denied the grievance, noting,

> According to your medical record, you have been followed.  The result
> of your last CT scan of your head was normal.  You have been seen by
> ophthalmology.  You had an arterial Doppler exam on 1-26-12 which
> was not clinically significant for findings.  A consult was placed for
> neurology and you are scheduled to be seen in the future.  If you are
> experiencing worsening symptoms, sign up for sick call.  In the
> meantime, I have scheduled you to see the physician here.

(*Id*. at 6.)  Plaintiff appealed this decision to the facility manager on May 21, 2012,

(*id*. at 5), who upheld the initial grievance response on May 25, 2012 (*id*. at 4).  In his

decision, the facility manager noted that, according to Plaintiff's medical records from both SCI-Coal Township and SCI-Smithfield, both medical departments have been active with his treatment needs. (*Id*.) Plaintiff then appealed this decision to SOIGA on June 1, 2012, specifically asking to be seen by a neurologist. (*Id*. at 3.) On June 13, 2012, Plaintiff was informed that his appeal was being referred to the Bureau of Health Care Services. (*Id*. at 2.) Thereafter, on July 2, 2012, Plaintiff received a final decision from SOIGA, which noted that the Bureau of Health Care Services had reviewed his records and determined that the medical care provided was reasonable and appropriate. (*Id*. at 1.) Therefore, Plaintiff's final appeal was denied. (*Id*.)

### d.   Analysis

From a careful review of the record, the court finds that Plaintiff has failed to exhaust his administrative remedies with respect to his claim against Dr. Dolphin. Again, in his amended complaint Plaintiff has alleged that Dr. Dolphin failed to secure an appointment with a mental health professional for Plaintiff to discuss his recurring dreams of being assaulted by inmate Mitchell, despite telling Plaintiff that he had done so. However, nowhere in the official grievances submitted, as well as the appeals therefrom, is there mention of Dr. Dolphin or of a request for a mental

health evaluation.  In Plaintiff's latest reply to Dr. Dolphin's motion, he attaches two

informal Inmate's Request to Staff Member forms, dated November 28, 2011 and

December 6, 2011, respectively, that set forth his medical and mental health

complaints to SCI-Smithfield staff.[13]  (Doc. 130 at 7, 8.)  Staff responded to both

requests.  (*Id*.)  In particular, Dr. Dolphin responded to the December 6, 2011 request,

stating that a psychiatrist had been contacted to speak with Plaintiff.  (*Id*. at 7.)  There

is nothing in the record indicating that Plaintiff subsequently filed an official

grievance setting forth his mental health complaints after he received responses to his

informal requests.  As such, Plaintiff has failed to exhaust his administrative remedies

with respect to his claim against Dr. Dolphin.  Further, in his responsive briefing to

the motion for summary judgment, Plaintiff makes no argument in favor of excusing

such failure to exhaust.

Even if Plaintiff had properly and fully exhausted his administrative remedies

here, he has failed to state a claim for inadequate mental health care against Dr.

Dolphin.  To establish a claim for inadequate medical care, the plaintiff must show:

---

[13]  The Inmate Request to Staff Member form is used as an initial step to informally resolve a concern with a facility's staff members.  (*See* Doc. 110-1 at 6, DC-ADM 804, Inmate Grievance System Procedures Manual.)  If an inmate has a concern that he is unable to resolve, the next step taken is to file an official grievance with the Facility Grievance Coordinator.  (*Id*.)  The record here demonstrates Plaintiff's familiarity with this procedure.

"(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).

Here, Plaintiff's allegation against Dr. Dolphin does not amount to deliberate indifference.  Deliberate indifference occurs where a defendant: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; (3) prevents a prisoner from receiving needed or recommended medical treatment; or (4) persists in a particular course of treatment "in the face of resultant pain and risk of permanent injury." *Rouse v. Allen*, 182 F.3d 192, 197 (3d Cir. 1999).  However, "claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" *Id*. (citing *Estelle*, 429 U.S. at 105); *see also Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (finding that if inadequate treatment results simply from an error in medical judgment, there is no constitutional violation); *Lanzaro*, 834 F.2d at 346 (stating mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim).  In *Estelle*, the Supreme Court held the following:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

*Estelle*, 429 U.S. at 105-06.

In this case, Plaintiff is alleging that Dr. Dolphin was deliberately indifferent to his medical needs by failing to secure an appointment with a mental health professional to discuss Plaintiff's recurring dreams of being assaulted by inmate Mitchell. However, the fact that Dr. Dolphin told Plaintiff that "somebody" was contacted to speak with Plaintiff and that person never met with Plaintiff does not rise to the level of a constitutional violation. Rather, at most, Dr. Dolphin's failure to follow up on that appointment for Plaintiff could be viewed as negligence. Thus, the court cannot conclude that Dr. Dolphin's presumed failure here rises to the level of deliberate indifference. *See Miller v. Maurer*, 173 F. App'x 991, 993 (3d Cir. 2006) ("A misplaced orthopedic consult and a scheduling error for a colonoscopy do not rise to the level of deliberate indifference"); *Bruner-McMahon v. Hinshaw*, 846 F. Supp. 2d. 1177, 1212-13 (D. Kan. 2012) (finding no deliberate indifference where nurse erred in scheduling an appointment for a prisoner who later died by concluding

43

"it appears that at most, she made a scheduling error.  A scheduling error, by itself, does not constitute deliberate indifference"); *McCardell v. Joubert*, Civ. No. DKC-12-2558, 2012 WL 6681999, at \*3 n.3 (D. Md. Dec. 21, 2012) ("Even if the court assumes that Dr. Joubert is responsible for a scheduling error, such error, without more, may not support a claim for relief.").

In sum, Plaintiff has failed to properly exhaust his administrative remedies with respect to his claim against Dr. Dolphin.  Furthermore, even if exhaustion could be excused, Plaintiff has failed to make a showing of deliberate indifference on the part of Dr. Dolphin.  Accordingly, summary judgment will be granted in favor of Dr. Dolphin.

## IV.   Conclusion

For the reasons set forth above, Corrections Defendants' motion for summary judgment (Doc. 124) will be granted.  In addition, Defendant Dr. Dolphin's motion to dismiss, which the court has converted to a motion for summary judgment (Doc. 109),

will be granted.  Judgment will be entered in favor of all Defendants and against

Plaintiff.

An appropriate order will issue.


                                          s/Sylvia H. Rambo_____
                                          United States District Judge

Dated:  January 28, 2016.